**INSTITUT PASTEUR and Centre National de la Recherche Scientifique, Plaintiffs,**

v.

**Adam J. SIMON, Ph.D., Defendant.**

**Civil Action No. 98–727.**

United States District Court,
E.D. Pennsylvania.

Aug. 19, 2005.

Albert J. Breneisen, Christopher L. Ogden, Patrice P. Jean, Richard S. Gresalfi, William G. James, Kenyon and Kenyon, Daniel F. Schiff, Dorsey & Whitley, LLP, New York City, David W. Marston, Jr., Thomas B. Kenworthy, John V. Gorman, Morgan, Lewis and Bockius LLP, Lynn Collins, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Mari Shaw, Obermayer Rebmann Maxwell & Hippel LLP, Philadelphia, PA, for Plaintiff.

Cutis B. Miner, David Boies, Boies & Schiller, LLP, Stephen R. Neuwirth, Armonk, NY, Daniel M. Cohen, H. Laddie Montague, Jr., Peter R. Kahana, Berger & Montague, PC, Philadelphia, PA, for Defendant.

## OPINION

POLLAK, District Judge.

Before this court is the motion of plaintiffs Institut Pasteur ("Pasteur") and Centre National de la Recherche Scientifique ("CNRS") for partial summary judgment dismissing three counterclaims of defendant Dr. Adam J. Simon ("Simon") on the ground that he has failed to present a factual basis that would support a finding of damages. This motion (Docket No. 183) is one of three partial summary judgment motions plaintiffs have filed challenging defendant's counterclaims. For the reasons stated below, plaintiffs' motion will be granted in substantial measure: the prayers for relief in counterclaims II and III will be dismissed, and the damages prayers for relief in counterclaim I will also be dismissed.

### I.

The general contours of this litigation and the underlying patent dispute are described in this court's partial summary judgment opinion, dated today, on the issue of ownership, and, more extensively, in

this court's November 13, 2003 opinion. Only those facts that are of particular pertinence to the present motion will be recited here.

In 1993, Simon, an American physicist who had recently received his Ph.D., was invited by a senior physicist at CNRS, a French governmental research and research-support entity, to come to Paris and participate in ongoing research concerning a process called molecular combing. For almost two years—from September 1993 until August 1995—Simon worked with several French scientists on this research. Simon generally worked at CNRS laboratories, but occasionally at Pasteur, a private research center that was collaborating with CNRS on the project.

Beginning in February 1994, plaintiffs filed a series of patent applications in France and the United States to protect the fruits of the research. The patent applications, and the patents that were subsequently issued, listed certain CNRS and Pasteur scientists as inventors, but they did not include Simon. Simon repeatedly challenged these omissions, citing what he saw as his inventive contributions to the research.

On February 7, 1995, more than a year after commencing this research at CNRS/Pasteur, Simon signed a document, written in French, reciting the assignment by Simon to CNRS of Simon's interest in the results of the research. The document was captioned *Conditions D'Accueil dans le Laboratoire [Terms of Admission to Laboratory]*: Article 3 of the *Conditions* stated that "les resultats de l'Etude, brevetables ou non ... sont la propriete pleine et entiere du CNRS" ["the results of the study, whether patentable or not ... are the full and complete property of

the CNRS"]; and Article 6—a handwritten addition—stated (in translation) "that inventors/authors of commercialized results will receive 25% of what is collected by the CNRS for the length of the commercial operation." The document bore the date September 1, 1993, the commencement of Simon's relationship with CNRS. Later in February of 1995, CNRS and Pasteur filed another patent application that, like the previous applications, did not name Simon as a co-inventor. United States patents were issued to CNRS and Pasteur in 1997 and 1998. Contending that he was at least a co-inventor, if not the sole inventor, of the technology described in these patents, Simon filed counter-patent applications in 1998.

Thereafter, CNRS and Pasteur filed this action, seeking a declaration that Simon has no cognizable interest, either as inventor or as owner, in the patented molecular combing processes. Simon filed six counterclaims, including three that are the subject of this motion. Counterclaim I alleges that Simon's signature on the February 7, 1995 document was procured by fraudulent inducement and duress, and is therefore void. Counterclaim II alleges that, should the court find that the February 7, 1995 document is valid, plaintiffs breached it by failing to list Simon as an inventor in the various patent applications. Counterclaim III alleges that plaintiffs engaged in a fraudulent scheme to deny Simon his rights as an owner and inventor of the molecular combing technology.[1] In the present motion, Pasteur and CNRS seek summary judgment dismissing all three counts on the ground that Simon has not suffered any damages.

---

1. Counterclaim IV seeks a declaratory judgment that Simon is entitled to be listed as an inventor on the patents. On August 30, 2004, this court dismissed counterclaims V and VI

for lack of subject matter jurisdiction. *See Institut Pasteur v. Simon*, 332 F.Supp.2d 755 (E.D.Pa.2004).

## II.

In addressing the question of damages, the parties have focused on the law of Pennsylvania. Bearing in mind that Pennsylvania is Simon's state of residence—the state in which, if he has suffered a legally cognizable injury, harm could be said to have accrued—the court finds no reason to depart from the parties' approach.

It is undisputed that, to date, all attempts to commercialize the patented molecular combing technology have been unsuccessful. Pasteur and CNRS have not earned any profits on the technology. Nonetheless, Simon estimates that he is entitled to at least $30,000,000 in damages. This estimate is not based on projected future revenues. Instead, Simon contends that the parties' protracted dispute over his inventorship and ownership status has diminished the value of the molecular combing technology and, as a result, caused him damage. The dispute has allegedly affected the value of the technology in two ways. First, Pasteur and CNRS did not attempt to commercialize the molecular combing technology until 1997. Simon contends that "it is a reasonable inference that the on-going ownership/inventorship dispute caused this delay" (Resp. Br. at 7), and that, had plaintiffs commercialized the technology at the time of its invention—during the "genomics boom period" of the mid–1990s—its value would have been far greater. Simon further contends that the very existence of the dispute, independent of its impact on the timing of commercialization, may have impeded successful marketing of the technology because "no commercial entity ... want[s] to invest time and money in a project concerning which ownership rights are in dispute." Resp. Br. at 11 (*quoting* Gallochat Declaration (Jan. 28, 1999) at ¶ 13).

As an initial matter, this court is impelled to express dubiety that Simon's theory of damages has as its predicate an adequate theory of causation. That is to say, it is not readily apparent that the fact that Simon and the plaintiffs have been locked in dispute for years—a dispute commencing in patent offices and maturing in court—constitutes a ground for assessing damages against one or another of the disputants who may be found not to prevail in a particular claim advanced in this litigation.[2]

■■■ But assuming, *arguendo*, that plaintiffs' role in opposing Simon's claims constitutes a sufficient basis for compensating Simon for any demonstrated injury, it is the court's view that both the existence and extent of Simon's alleged damages are far too speculative to be submitted to a jury. The general rule in Pennsylvania, as in most jurisdictions, is that damages may not be awarded on the basis of speculation or conjecture. *See Spang & Co. v. United States Steel Corp.*, 519 Pa. 14, 545 A.2d 861, 866 (1988); Restatement (Second) of Contracts § 352 ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."). In applying this standard, courts routinely distinguish between un-

---

**2.** In ruling today on a companion partial summary judgment motion, this court has concluded, contrary to plaintiffs' contention, that Simon's claims of inventorship have sufficient traction so that they should be resolved at trial by the jury; so it may be that Simon will prevail on one or more of these claims. But in another ruling today, this court has found plaintiffs entitled, as a matter of law, to a judgment declaring that plaintiffs, rather than Simon, own the product of the research Simon conducted at plaintiffs' laboratories. If Simon prevails on some aspects of inventorship, does plaintiffs' resistance to those claims entitle Simon to damages? If this court's ruling on ownership remains undisturbed, would plaintiffs have had a basis for seeking damages?

certainty as to the fact of damage and uncertainty as to the amount of those damages. Whereas uncertainty as to whether the plaintiff sustained any damage at all will bar recovery, some uncertainty as to the precise amount of damages will be tolerated. The amount of damages need not be established with "mathematical exactitude" *Ashcraft v. C.G. Hussey & Co.*, 359 Pa. 129, 58 A.2d 170, 172 (1948). However, a party seeking damages must provide the jury with sufficient evidence so that damages may be established with reasonable certainty. "At minimum, reasonable certainty embraces a rough calculation that is not 'too speculative, vague, or contingent' upon some unknown factor." *ATACS Corp. v. Trans World Communications, Inc.*, 155 F.3d 659, 669 (3d. Cir.1998) (*quoting Spang*, 545 A.2d at 866).

In the case at bar, both the fact and amount of Simon's damages are speculative. Simon's theory of damages, as outlined above, assumes that, in the absence of the dispute, the commercialization of molecular combing would have been both successful and highly lucrative. However, this outcome is conjectural. Simon's experts speak in very broad terms about the commercialization of technologies in the "genomics" market generally; about the hypothetical possibility that molecular combing might have been successfully commercialized under different circumstances; and about the fact that ownership and inventorship disputes can have an impact on the value of a patented technology.

In her expert report, one of Simon's damages experts, Vivian Lee, concludes:

> In looking at the introduction of molecular combing technology relative to the chronology of trends in market sentiment, one could imagine that the ideal window of opportunity for commercializing this technology would have been in the mid 90s. If, for example, a company

were founded around molecular combing in the 1994–96 timeframe, it would have been ideally poised to capture much greater value during the genomics boom than at any time since. Failure to seize such a window of opportunity could result in significant loss of value regardless of the inherent merits of the technology. . . .

> Molecular Combing as a technology might have been successfully commercialized in the mid/late–90s, such as in the form of a spin-off company that raised venture financing and secured corporate partnerships and then diversified beyond its core technology. This report has listed examples of comparable technologies of that era which became the basis of start-up companies that have created value as much as several hundred million dollars. It is reasonable to believe that with effective strategic management, Molecular Combing could have been the original basis for a commercial entity with a value today in the range of $100–$300 million.

Resp. Br. at 9 and 15 (*quoting* Lee Expert Report at 11 and 16–17). Lee's conclusions rest on a series of unsupported, and unexplored, assumptions. For example, there is no evidence in the record to suggest that: (1) CNRS or Pasteur or Simon would have had the time, resources, or inclination to form a "spin-off" company; or (2) the imagined "spinoff" company could have obtained the necessary financing and corporate support. Lee's expansive horizons are visionary, but not rooted in the record.

Simon's second damages expert, Russell L. Parr, describes how ownership and inventorship disputes can have an impact on the value of underlying patents. Like Lee, Parr expresses his opinion in general terms, with scant reference to the actual dispute between the parties in this case

and the effect, if any, the dispute may have had on the value of molecular combing. *See* Parr Expert Report, Ex. 18, 3–4. Apart from a brief reference to the deposition testimony of Dr. Francois Heslot, Parr's report principally consists of broad observations about the impact patent disputes can have on a technology's value:

> My experience has taught me that companies do not wish to invest in the development of technology where ownership disputes exist. Furthermore, venture capitalists and other sources of capital do not want to risk their investment in the development of disputed inventions. The simply (sic) reason has to do with competition and erosion of return on investment. It is possible that development of disputed technology, at the costs of millions of dollars, could leave those who invested in the development with a new commercial technology that can immediately be copied by others. The instant competition keeps the initial investors from dominating the market and being able to earn enough profits to recover their development investment. In this case, Dr. Heslot says a dispute over ownership kept at least one party from even considering he (sic) development of Molecular Combing.[3]

Parr Reply Report, Ex. 20 at 6.

In response to plaintiffs' damages expert, Dr. Kathleen Denis, Parr himself highlights the speculative nature of Simon's damages:

> Dr. Denis' report emphasizes the risks of commercialization. It is true that among the universe of inventions few are patented and even fewer are com-

mercialized. It is also true that few patented inventions that are commercialized generate substantial returns to their owners. But it is also true that some technologies generated enormous profits for their inventors and Dr. Denis has not commented on the value that Molecular Combing could have generated had it been successfully developed. *Id.*

The evidence proffered by Simon and his experts does not provide a jury with a basis to determine whether Simon incurred any damages—or, if he did, to calculate the amount of such damages—without engaging in sheer guesswork about what molecular combing technology might have been worth if it had been developed under different circumstances. Guesswork is not a proper mode of adjudication—whether by a jury, as in the case at bar, or by a judge.

## III.

Accordingly, in an order accompanying this opinion, partial summary judgment will be granted dismissing defendant Simon's prayers for relief in counterclaims II and III, and dismissing paragraphs 2, 3 and 4 of Simon's prayer for relief in counterclaim I.

## ORDER

For the reasons set forth in the accompanying opinion, it is hereby **ORDERED** that plaintiffs' motion for partial summary judgment with respect to damages (Docket No. 183) is **GRANTED** to the following extent: Paragraphs 2, 3, and 4 of defen-

---

3. In his deposition, Dr. Francois Heslot, one of the scientists with whom Simon worked at CNRS, testified that when he mentioned molecular combing to Mr. Vassuer, of the biotech company Genset, Mr. Vassuer responded that Genset "would not put a foot to it" because of this litigation. Heslot Dept., Ex 6., at 24:18–25:14. When asked if he had ever spoken to representatives of any other companies about the molecular combing technology, Dr. Heslot responded, "I would not dare do it," noting, "I got feedback from people at FIST [a department within CNRS] and that feedback was, the situation is a mess because of the situation." *Id.* at 26–27.

dant's prayer for relief relating to counter-claim I are **DISMISSED**. Defendant's prayers for relief relating to counterclaims II and III are **DISMISSED** in their entirety.